UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

WILLIAM R. JOHNSON,

      Plaintiff,

      v.

JPMORGAN CHASE & CO., *et al.*,

      Defendants.

Case No. 2:11-CV-00373
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth P. Deavers

## OPINION AND ORDER

Plaintiff, William R. Johnson, brings this action against Defendant, Chase Bankcard Services, alleging disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and Ohio's anti-discrimination statute, Ohio Revised Code, § 4112.01 *et seq.* Additionally, Plaintiff brings a claim of wrongful adverse action in violation of Ohio public policy. This matter is currently before the Court for consideration of Defendant's Motion for Summary Judgment. (ECF No. 25.) For the reasons that follow, Defendant's Motion is **GRANTED**.

## I. BACKGROUND

This employment dispute centers around Plaintiff's requests concerning working conditions and his supervisor's responses to those requests. Plaintiff is a large man, standing 6'11" inches tall and weighing well over 300 pounds. (*Id.* at 83–84.) He began working for Defendant in September 2002 as a financial services advisor.[1] (Pl. Dep. 145, 154, ECF No. 19.) Plaintiff's work involves speaking with customers in a seated position. (*Id.* at 151.) Plaintiff

---

[1] Plaintiff received a promotion to financial services advisor senior in October 2003. (Pl. Dep. 154.)

initially worked ten-hour shifts. (*Id.* at 150–51.)

Plaintiff contends that he is disabled due to chronic pain associated with a neck injury. (*See* Pl. Dep. 208, 211, 222.) Plaintiff states that in addition to neck pain, he experiences pain in his left shoulder and upper back. (*Id.* at 211.) According to Plaintiff, his employment conditions caused, or at least increased the severity of, his neck pain. (*See, e.g.*, *id.* at 210.) Plaintiff states that he began experiencing neck pain in September 2002 during training for his position. (*Id.* at 240.) During his deposition, Plaintiff stated that he is unable to perform many household duties due to his condition. (*Id.* at 144.) Plaintiff also averred that the only cooking he does is with a microwave or deep fryer. (*Id.*) Additionally, Plaintiff stated that he suffers from memory lapses because he is unable to sleep because of his neck pain. (*Id.* at 70–71.)

## A.     Pre-2009 Working Conditions and Requests[2]

Plaintiff maintains that he first brought his neck pain to the attention of his supervisor, at that time Rachel White, in January 2003. (*Id.*) According to Plaintiff, he informed Ms. White that he was having "tremendous pain in [his] neck and upper shoulder" and that he needed a

---

[2] During the relevant period, Defendant had a policy, entitled "Disability and Reasonable Accommodation," which provided guidance to employees regarding disability accommodation requests. (Pl. Dep. Ex. 5, ECF No. 19-1.) The policy provides, in relevant part:

> If you believe you have a disability and need an accommodation to enable you to perform the essential functions of your job, contact your manager, Human Resources Business Partner or Employee Relations Advice Connection (as appropriate for your line of business). You may be asked to provide medical certification related to your medical condition to the firm's Health Services Department or Disability Management Services Department. . . .

(*Id.*) The policy also stated that employees should immediately report "any failure to provide a necessary and reasonable accommodation," providing various options for potential employees to contact. (*Id.*)

larger chair. (*Id.* at 210.) In response, Ms. White arranged for Plaintiff to receive a new chair

with the assistance of Operations Manager Bruce Ostermeyer. (*See id.* at 215; White Dep.

10–11, ECF No. 20; Ostermeyer Dep. 8–9, ECF No. 21.) According to Ms. White, Plaintiff

pointed out to her the specific chair that he wanted. (White Dep. 10–11.) Although the timing of

events is somewhat unclear, a June 2003 note from Ms. White indicates that it took

approximately seven months for Plaintiff's chair to arrive.[3] (White Dep. 26–27; White Dep. Ex.

4, ECF No. 20-1.)

Plaintiff was not satisfied with the chair he received in 2003 because he felt that it was

suited for an overweight person, but not a tall person. (Pl. Dep. 243.) Plaintiff states that he told

Ms. White that the chair was inadequate and she told him to speak with Mr. Ostermeyer. (*Id.* at

251.) Plaintiff asserts that he spoke to Mr. Ostermeyer about his need for a different chair fifteen

to twenty times between May 2003 and February 2009. (*Id.* at 252.) Plaintiff states that he

specifically informed Mr. Ostermeyer that he required additional back and neck support. (*Id.* at

251.) According to Plaintiff, on one occasion Mr. Ostermeyer asked him "do you want a recliner

with a beer cooler and a TV attached to it?" (*Id.*) Plaintiff avers that, on a different occasion,

Mr. Ostermeyer voiced concerns that if Plaintiff received a new chair he would have to get new

chairs for everyone. (*Id.* at 252.) Plaintiff also states that Mr. Ostermeyer repeatedly told him,

with regard to the chair request, that he was "looking into it." (*Id.* at 251–52.) Plaintiff

---

[3] Plaintiff and Ms. White both state the wrong chair was initially delivered. (Pl. Dep. 215; White Dep. 11.) According to Ms. White, the chair that initially came in had more padding than the standard chairs, but was otherwise the same size. (White Dep. 11.) Although Ms. White's June 2003 note suggests that it took "at least seven months" to obtain the chair, other portions of the record indicate that Plaintiff received the chair in May 2003. (*See* White Dep. Ex. 4; Pl. Dep. 250–51.)

3

maintains that during this period he repeatedly went to Mr. Ostermeyer with his requests because Mr. Ostermeyer was the site manager and Plaintiff "didn't feel comfortable going around him." (*Id.* at 252.)

In addition to his chair requests, Plaintiff also made requests involving his computer monitor. Specifically, Plaintiff asserts that in January 2004 he requested a larger computer monitor. (Pl. Dep. 260.) Plaintiff admits that this request was due to his vision, but he also states that his trouble viewing the monitor caused him to lean back and forth during the day, further aggravating his neck problems. (*Id.* at 220–22.) Although Ms. White recalls Plaintiff making a request concerning his computer monitor, she does not recall him indicating that he needed to lean forward to see his computer screen. (White Dep. 12.) Rather, Ms. White generally recalls Plaintiff having trouble seeing his computer due to glare. (*See id.*) In May 2005, having not received a larger monitor, Plaintiff states that he submitted medical documentation from an optometrist to support his request for a larger monitor. (Pl. Dep. 262.) With his supervisor's permission, Plaintiff was able to temporarily gain a larger monitor around the fall of 2005, and he was able to permanently obtain a larger monitor by trading with a co-worker in the spring of 2006. (*Id.* at 263, 269–70.)

During the same general time frame, Plaintiff also began requesting a monitor riser for his computer screen because his current riser did not work.[4] (Pl. Dep. 224–25, 271–72.) According to Plaintiff, he required a monitor riser so that he could stand, stretch, and move around while working. (*Id.* at 222–23.) Moreover, Plaintiff suggests that monitor risers were common

---

[4] The timing of this request is somewhat unclear. At one point in his deposition, Plaintiff implied that he first asked for a monitor riser in January 2004. (Pl. Dep. 223–24.) At another time, however, Plaintiff stated that he first made this request in fall 2005. (*Id.* at 271.)

4

company equipment. (*Id.* at 224.)

Beginning in or around 2006, Melissa Blair became Plaintiff's team manager and supervisor. (Blair Dep. 9, ECF No. 22.) Plaintiff maintains that when he spoke to Ms. Blair about his need for a monitor riser, she told him that she would submit a request. (Pl. Dep. 271–72.) Plaintiff indicates that he followed up on this request with Ms. Blair, but did not receive a monitor riser. (*See id.* at 276–77.) As discussed further below, Plaintiff asserts that he did not receive a functioning monitor riser until February 2011. (*Id.* at 272.) According to Ms. Blair, Plaintiff made a request to her for a new chair in 2008. (Blair Dep. 22–23.) Ms. Blair states that she transferred Plaintiff's request to her immediate supervisor, Amanda Queen. (*Id.* at 24.) Ms. Blair avers that, at least in 2009, Plaintiff expressed that his back and neck were bothering him. (*Id.* at 38.) Additionally, Ms. Blair states that although she did not find that Plaintiff's back and neck problems were impacting the quality of his work, she was aware that he took leave under the Family Medical Leave Act ("FMLA") due to his back and neck condition. (*Id.*)

**B.     FMLA Leave, Work Assessment Request, and Disability Leave**

The record reflects that Plaintiff received chiropractic treatment in mid-2006. (*See* Pl. Dep. 298–300.) On September 20, 2006, Plaintiff requested leave under the FMLA. (Pl. Dep. Ex. 12, ECF No. 19-1.) Within his application, Plaintiff indicated that leave would be on an intermittent basis, as necessary, in response to "flareup[s]" in his neck, arm, and wrist. (*Id.* at 1) An attached medical certification provides that Plaintiff's neck pain was indicative of neuritis and that his condition commenced in August 2006. (*Id.* at 2.) Plaintiff obtained FMLA leave on additional occasions during 2007, 2008, and 2009. (*See, e.g.*, Pl. Dep. Exs.13–15, 17, ECF No.

5

19-1.) Although some of Plaintiff's leave requests during this period were for his neck condition, he also requested leave for different conditions including pneumonia and edema. (*See,* e.g., Pl. Dep. Ex. 13 at 3; Ex. 15 at 2.)

In February 2009, Plaintiff provided Ms. Blair with a note from his doctor stating that he "need[ed] to have an occupational work station evaluation to allow for better ergonomics due to his height and medical conditions." (Pl. Dep. Ex. 20, ECF No. 19-1.) Dianne Noel, an Occupational Health Nurse with Defendant, contacted Plaintiff regarding this request. (Noel Dep. 25, ECF No. 23.) On March 13, 2009, Christina Tonic Gold, an ergonomic evaluator, attempted to schedule Plaintiff for an appointment for March 20, 2009. (Pl. Dep. 330–33.) Plaintiff canceled this appointment because of FMLA leave. (*Id.* at 333.) Ms. Gold attempted to re-schedule an evaluation for March 27, 2009, but Plaintiff was again unable to meet with her due to FMLA leave. (*Id.* at 334–35.) In May 2009, Ms. Gold and Plaintiff exchanged emails in which they agreed that Plaintiff would contact her to set up a workplace assessment upon his return to work. (Pl. Dep. Ex. 29, ECF No. 19-1.)

Plaintiff began receiving short-term disability benefits due to his neck pain in March 2009. (Pl. Dep. 336–37.) In June and July 2009, two of Plaintiff's physicians opined that Plaintiff's work conditions aggravated his cervical spondylosis. (Pl. Dep. Exs. 31–32, ECF No. 19-1.) Plaintiff received long-term disability benefits from September 2009 until April 2010.[5] (Pl. Dep. 337–38.)

---

[5] Plaintiff filed a charge of disability with the Ohio Civil Rights Commission ("OCRC"), and Equal Employment Opportunity Commission ("EEOC"), in January 2010. (Mem. Opp'n Ex. A, ECF No. 26-1.)

C.    **Internal Job Search and Return to Work**

Following termination of his long-term disability leave, Defendant allowed Plaintiff to engage in an unpaid internal job search. (*See* Pl. Dep. 349–52.) In August 2010, Plaintiff received a position allowing him to return as a financial service advisor. (*Id.* at 356–57.) In late August 2010, prior to his return to work, Plaintiff submitted a letter from his chiropractor stating that his employer needed to provide Plaintiff with an ergonomically correct chair. (Pl. Dep. Ex. 28, ECF No. 19-1.) On September 3, 2010, Ms. Noel ordered a custom built chair for Plaintiff. (Noel Dep. 51–52.) This chair ultimately arrived on October 13, 2010. (*Id.* at 53.)

Plaintiff participated in training for his return position from September to October 2010. (*See* Pl. Dep. 358, 369.) In September 2010, Plaintiff submitted a request from his chiropractor for an ergonomic assessment of Plaintiff's workstation. (*Id.* at 359; Pl. Dep. Ex. 28.) At this time, Ms. Noel advised Plaintiff that Defendant could not complete a workplace assessment until Plaintiff completed training and received a workstation. (Pl. Dep. 359–60.) Plaintiff finished training and returned to work on October 18, 2010. (*Id.* at 369.)

Plaintiff completed an ergonomic survey on or around November 1, 2010 and Ms. Gold conducted an ergonomic evaluation on November 16, 2010. (*Id.* at 370–71; Gold Dep. 22–23.) Following the evaluation, Ms. Gold recommended that Plaintiff receive a sit/stand workstation and a device that allowed him to adjust his monitor height. (Gold Dep. 26–29.) After the evaluation, Defendant ordered Plaintiff a sit/stand workstation, which was ultimately installed on January 30, 2011. (Pl. Dep. 373.) Plaintiff received a monitor riser in February 2011 because the sit/stand station did not extend high enough. (Id. at 373–74; Noel Dep. 48.)

Plaintiff continues to work for Defendant as a senior financial advisor. (Pl. Dep. 26,

158–60.)  In light of recommendations from his doctor, Plaintiff works four-hour shifts and gets up and walks around once every hour.  (*Id.* at 369; *see also* Pl. Dep. Ex. 28.)  Plaintiff filed this action in May 2011.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion . . . ." *Id.* at 323.  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts").  Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

8

prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251–52.

## III. ANALYSIS

As detailed above, Plaintiff maintains that Defendant engaged in disability discrimination

in violation of the ADA and Chapter 4112 of the Ohio Revised Code.[6]  As a preliminary matter,

the Court notes that the ADA Amendments Act of 2008, which became effective on January 1,

2009, substantively altered the ADA to provide broader coverage. *Donald v. Sybra, Inc.*, 667

F.3d 757, 764 (6th Cir. 2012). The amendments to the ADA, however, are not retroactive. *Id.*

---

[6] In addition to claims under the ADA, Plaintiff also brings failure to accommodate and disability discrimination claims under Chapter 4112 of the Ohio Revised Code. As both parties acknowledge, Ohio disability discrimination law generally applies the same analysis as the ADA. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010). Accordingly, Ohio courts "look to regulations and cases interpreting the [ADA] for guidance in [their] interpretation of Ohio law." *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St. 3d. 569, 573 (1998). Consequently, in this case, both parties analyze Plaintiff's statutory claims under the ADA. Accordingly, the Court will analyze both sets of claims together.

The Court notes that at least one Ohio court has held that Chapter 4112 of the Ohio Revised Code defines perceived disability differently than the ADA prior to its amendment by the ADA Amendments Act of 2008. *See Scalia v. Aldi, Inc.*, No. 25436, 2011 WL 6740756, at *7–8 (Ohio Ct. App. Dec. 21, 2011) ("Because the plain language of the definition of disability contained in R.C. 4112.01 differs in substance from the ADA, it is not appropriate to look to federal materials interpreting the pre–2008 ADA with respect to perceived disability claims under Ohio law."). The Court is not convinced, however, that any potential difference in the definition of perceived disability materially influences the outcome as to Plaintiff's state-law claims. First, under either form of the ADA, perceived disability does not entitle an employee to reasonable accommodation. *See, e.g., Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 11 n.1 (6th Cir. 2012) ("[A] plaintiff bringing a 'regarded as' claim, []would not be entitled to the benefit of a reasonable accommodation."); *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999) (holding that an employee merely being "regarded as" disabled did not obligate the employer to make reasonable accommodations). Although it does not appear that Ohio courts have reached this issue as to Chapter 4112, the Court presumes that Ohio courts would look to prior interpretation of the ADA for guidance. Second, even if Defendant's perceived Plaintiff as having a disability for the purpose of his disability discrimination claims, for reasons described below, he fails to establish adverse employment action under Ohio law.

Accordingly, to the extent Plaintiff's claim concerns Defendant's actions prior to 2009, the Court will apply the prior version of the ADA.

Discrimination under the ADA includes both (1) taking an adverse action against an employee "on the basis of disability" and (2) failing to make reasonable accommodations for the known limitations of an employee with a disability. 42 U.S.C. §§ 12112(a), 12112(b)(5)(A). Although Plaintiff's claims center around assertions of failure to accommodate, both his Complaint and briefing indicate that he also maintains that this failure to accommodate ultimately resulted in adverse action. (*See* Compl. ¶¶ 33, 39, ECF No. 1.) Accordingly, the Court will consider both theories of liability.

## A.     **Failure to Accommodate**

The United States Court of Appeals for the Sixth Circuit has set forth the following requirements for a failure to accommodate claim under the ADA:

> In order to establish a prima facie case for failure to accommodate, a plaintiff must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation.

*Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011).

Prior to 2009, the ADA defined disability, in relevant part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such an individual." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008). Under this standard, "[n]o impairment constitutes a disability per se; rather, an impairment is a disability if it limits the major life activities of the particular individual who is impaired." *Brown v. BKW*

10

*Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 824 (S.D. Ohio 2004). "Major life activities are those that are of central importance to daily life, . . . such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Brady v. Potter*, 273 F. App'x 498, 502 (6th Cir. 2008) (internal quotations and citations omitted). "The term 'substantially limits' means inability to perform, or a severe restriction on the ability to perform, as compared to the average person in the general population." *Brown*, 305 F. Supp. 2d at 824 (citing prior version of 29 C.F.R. § 1630.2(I)). "A substantial limitation of such an activity exists when the individual's ability to perform that activity is limited to a large degree. . . . It is not enough for the impairment to cause merely moderate or intermittent interruptions in the performance of the activity."[7] *Brady*, 273 F. App'x at 502 (internal citation omitted).

In addition to actually having a disability, a plaintiff must request an accommodation and a defendant must receive notice, either actual or constructive, that the plaintiff's request is linked to a disability. *See Brown*, 305 F. Supp. 2d at 828 ("[A] person alleging a disability protected by the ADA must establish that his employer had either actual or constructive notice of the disability."); *Russell v. National Amusements, Inc.*, No. 3:07 CV 3216, 2009 WL 262494, at *13 (N.D. Ohio Feb. 4, 2009) ("By making this request, and linking it to an impairment, Russell

---

[7] Under the ADA Amendment Act of 2008, disability is still defined, in part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(1). Nevertheless, the ADA now states that "[t]he term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008." 42 U.S.C. § 12102(4)(B). "Through the amendments, Congress intended to no longer require 'that to be substantially limited in performing a major life activity under the ADA an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.'" *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 659 (W.D. Ky 2012) (quoting Pub. L. No. 110-325 § 2(b)(4) (2008)).

11

sufficiently requested a 'reasonable accommodation.'"). Although "an employee need not use the magic words 'accommodation' or even 'disability,' the request does need to make it clear from the context that it is being made in order to conform with existing medical restrictions." *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007); *see also Alexander v. Trilogy Health Servs., LLC*, No. 1:11–cv–295, 2012 WL 5268701, at *12 (S.D. Ohio Oct. 23, 2012) ("What matters under the ADA . . . [is] whether the employee . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation.") (internal quotations omitted).

Importantly, at least within the pre-amendment context, "[k]nowing that an employee has health problems . . . is not the same as knowing that the employee suffers from a disability." *Brown*, 305 F. Supp. 2d at 829. Rather, a plaintiff "must show that a supervisor knew that he had an impairment that substantially limits one or more of the major life activities." *Leeds v. Potter*, 249 F. App'x 442, 450 (6th Cir. 2007) (holding that supervisor's admission of knowing that Plaintiff had a handicap placard was insufficient to establish knowledge of disability); *cf. also Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998) ("The employer is not required to speculate as to the extent of the employee's disability . . . .") Moreover, this Court has indicated that "[o]ften, the only way an employer can know whether an employee's health problems constitute a disability is if the employee provides it with some form of medical documentation." *Brown*, 305 F. Supp. 2d at 829.

Once the employee has provided adequate notice of an accommodation request, this triggers an interactive process and " both parties have an obligation to proceed in a reasonably interactive manner" to determine potential accommodations. *Kleiber v. Honda of Am. Mfg., Inc.*,

12

420 F. Supp. 2d 809, 826 (S.D. Ohio 2006). Considering the decision of another circuit, the

Sixth Circuit has implied that the following elements apply to a claim for failure to interact:

> [T]o show that an employer failed to participate in the interactive process, a disabled
> employee must demonstrate: 1) the employer knew about the employee's disability;
> 2) *the employee requested accommodations* or assistance for his or her disability; 3)
> the employer did not make a good faith effort to assist the employee in seeking
> accommodations; and 4) the employee could have been reasonably accommodated
> but for the employer's lack of good faith . . . .

Clark v. Whirlpool Corp., 109 F. App'x 750, 755 (6th Cir. 2004) (emphasis added in original)

(quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319–20 (3d Cir. 1999)).

Finally, in considering whether an employer has provided the necessary accommodation,

an employer is not generally required to act immediately. *Gerton v. Verizon South Inc.*, 145 F.

App'x 159, 168 (6th Cir. 2005). Rather, an employee must produce evidence demonstrating that

any "delay in [responding to] her request for accommodation was unreasonable." *Id.* at 169.

Moreover the Sixth Circuit has provided that "an employee cannot base a disability

discrimination claim upon an employer's delay in providing a requested accommodation where

the delay is due to internal processing or to events outside the employer's control." *Id.* at 168.

### 1.  Pre-2009 Claims

Under the circumstances of this case, the Court finds that there are no genuine issues of

fact and that Defendant is entitled to judgment as a matter of law as to Plaintiff's failure to

accommodate claim. Plaintiff's claims focus on his supervisors' failure to provide—and delay in

providing— work equipment that he requested from 2003 until 2009. Specifically, Plaintiff

requested a chair that could adequately support both his height and weight; a larger computer

monitor; and a riser for his computer monitor. (*See, e.g.,* Pl. Dep. 223–24, 251–52, 260–62,

13

271–72.)  During this period, Plaintiff made these requests to his supervisors, and most

prominently, Ms. White, Mr. Ostermeyer, and Ms. Blair.  (*See id.*)  According to Plaintiff, he

made these requests due to his neck condition.[8]  (*See id.* at 222.)

      First, Plaintiff has failed to provide sufficient evidence that his neck condition was a

disability prior to 2009.  At the time of his December 2011 deposition, Plaintiff averred that his

neck condition limited his ability to do household chores, cook, and sleep.  (*See* Pl. Dep. 70–71,

144.)  Even assuming such restrictions are severe enough to amount to a substantial limitation of

a major life activity, however, it is clear from the record that Plaintiff's condition worsened over

time.  For the period from 2003 to 2006, Plaintiff relies primarily, if not solely, on his subjective

complaints of pain to establish disability.  Plaintiff's testimony regarding his pain, however, does

not indicate that he was severely restricted in any major life activities at this time.  Beginning in

2006, the record contains medical documentation attached to Plaintiff's FMLA leave requests.

Nevertheless, much of this documentation concerns conditions unrelated to, or only peripherally

related to, Plaintiff's neck condition.  (*See,* Pl. Dep. Exs.12–15, 17.)  Although Plaintiff's FMLA

leave documentation does indicate that he was suffering from severe neck pain beginning in

2006, the evidence provides limited detail regarding Plaintiff's neck condition.  (*See, e.g.*, Pl.

Dep. Ex. 12 at 3.)  At most, the medical evidence contains conclusory physician notes that

Plaintiff's neck pain would likely result in "incapacity" (from work) on an intermittent basis

because of "flare-ups."  (*Id.*)  Finally, at his deposition, Plaintiff conceded that his condition does

not interfere with a variety of major life activities including caring for himself, standing, and

---

[8]  The Court agrees with parties that the evidence does not reflect that Plaintiff's height, in and of itself, was a disability within the meaning of the ADA.

14

walking.  (Pl. Dep. 237.)

Plaintiff fails to submit sufficient evidence regarding the restrictions for a reasonable jury

to conclude that his neck condition was a disability prior to 2009.  As Defendant notes, both the

Sixth Circuit and this Court have found that plaintiffs were not disabled under similar

circumstances.  *See, e.g.*, *Adams v. Potter*, 193 F. App'x 440, 444 (6th Cir. 2006) (holding that a

plaintiff with spondylolisthesis and radiculopathy had failed to establish that his back problems

substantially limited his major life activities); *Thompson v. Potter*, No. C2-04-291, 2006 WL

783395, at * (S.D. Ohio Mar. 27, 2006) (holding that a plaintiff with a lumbar strain and disc

degeneration did not demonstrate sufficient limitations to constitute disability).  Moreover, "[t]he

fact that Plaintiff took FMLA leave does not equate to a disability under the anti-discrimination

statutes."  *Pollard v. Alsco, Inc.*, No. 1:09–cv–873, 2011 WL 1595147, at *6 (S.D. Ohio Apr. 27,

2011).  This Court has acknowledged that, under certain circumstances, "flare-ups caused by an

underlying chronic condition may constitute a disability if they occur with sufficient frequency

and are of sufficient duration and severity to substantially limit a major life activity."  *Brown*,

305 F. Supp. 2d at 827–28.  Plaintiff's medical documentation, however, provides little

information regarding the frequency and duration of the "flare-ups" of his neck condition.  (*See*

Pl. Dep. Ex. 12 at 3.)  Accordingly, this information is not enough to show that Plaintiff was

unable to perform, or severely restricted in performing, a major life activity.

Second, even assuming that Plaintiff's neck condition was a disability within the meaning

of the ADA, the evidence demonstrates that Defendants did not have either actual or constructive

knowledge of this disability prior to 2009.  Specifically, the record evidence indicates that

Plaintiff's supervisors—to whom he was making requests for equipment during this period—had

15

only a limited awareness of Plaintiff's neck condition. First, Plaintiff's testimony reflects that, in making chair requests to Ms. White and Mr. Ostermeyer, he only generally referenced his neck pain and did not provide supporting medical documentation. (*See, e.g.*, Pl. Dep. 210, 250–52, 259.) Likewise, the evidence indicates that when Plaintiff made monitor-related requests to his supervisors, he, at most, only mentioned his neck pain. (*See, e.g.*, Pl. Dep. 223, 260–63, 266, 271–74, 276–77.) Although Plaintiff did provide medical documentation to support his request for a larger monitor, this documentation indicated that the need was due to Plaintiff's vision, not his neck condition. (Pl. Dep. 220.)

Moreover, Plaintiff's FMLA requests, from 2006 through 2008, were not sufficient to give the supervisors notice of Plaintiff's disability. As detailed above, Plaintiff's FMLA requests during this period were for intermittent leave from work, and only some of Plaintiff's requests actually concerned Plaintiff's neck condition. (*See* Pl. Dep. Exs. 12–15, 17.) Furthermore, the medical information within these leave requests does not specifically detail the limitations Plaintiff's neck condition was causing. (*See id.*)

Perhaps most importantly, the evidence indicates that Plaintiff's supervisors had limited knowledge regarding the content of Plaintiff's FMLA leave requests and the details of Plaintiff's neck condition. Mr. Ostermeyer, to whom Plaintiff made the majority of his chair requests, avers that he only had a vague awareness that Plaintiff was taking FMLA leave and further states that he did not have discussions with Plaintiff regarding his back and neck pain. (Ostermeyer Dep. 11–12, 15.) Ms. Blair's testimony indicates that she knew Plaintiff was having back and neck pain; that he was having trouble sitting for the periods his position required; and that he was taking intermittent FMLA leave because of his neck condition. (*See* Blair Dep. 20, 30, 43.) At

16

the same time, however, Ms. Blair does not suggest that she had anything more than a surface knowledge of Plaintiff's condition and the limitations his pain caused. (*See id.*) Tellingly, Ms. Blair states that, beyond his need to take intermittent FMLA leave, Plaintiff's conditions were not impacting the quality of his job performance.[9] (*Id.* at 43.)

Ultimately, under these circumstances, a reasonable jury could not conclude that Plaintiff's supervisors were aware, or had reason to know, that Plaintiff's neck pain substantially limited him in one or more major life activities. Once again, knowledge of health problems is not sufficient to establish that an employer knew of a disability. *Brown*, 305 F. Supp. 2d at 829. Here, although Plaintiff's requests may have put his supervisors on notice that he was experiencing neck pain, they did not make clear that he was making his requests because of a disability. Additionally, in making his requests during this time, Plaintiff did not provide medical documentation to his supervisors relating to his neck condition. Finally, the fact that some supervisors were aware that Plaintiff was taking intermittent FMLA leave due to neck pain is not, without more, enough to establish that these supervisors knew that Plaintiff had a disability. *See Nilles v. Givaudan Flavors Corp.*, No. 1:10–cv–919, 2012 WL 1537613, at *6 n.22 (S.D. Ohio May 1, 2012) ("Simply because [a supervisor] knew that Plaintiff took FMLA Leave . . . does not establish that [the supervisor] knew that Plaintiff was disabled.") ; *cf. also Brown*, 305 F. Supp. 2d at 829 ("To construe an employer as having notice of an employee's disability every time an employee is absent from work for a medical reason would defy common

---

[9] During her deposition, Ms. White testified that she could not remember Plaintiff discussing back or neck pain while she was supervising him. (White Dep. 30.) The Court recognizes that Plaintiff's deposition testimony contradicts this statement and must be credited at this stage in proceedings. Nevertheless, Plaintiff still fails to provide evidence that Ms. White had a significant level of knowledge regarding his neck condition.

17

sense."). Under the circumstances of this case, Plaintiff did not sufficiently link his accommodation requests to a disability. In other terms, Plaintiff did not provide enough information to his supervisors in making his requests to put them on notice that his neck condition rose to the severity of a disability.

### 2.    Post-2009 Claims

Defendant is also entitled to judgment as a matter of law to the extent Plaintiff basis his failure to accommodate claims on Plaintiff's post-2009 actions. Even assuming that Plaintiff has established a triable issue as to disability and knowledge after 2009, he has not established that Defendant failed to accommodate him during this period. Instead, the record reflects that beginning in 2009, Defendant was responsive to—and did not unreasonably delay—Plaintiff's requests.

First, the evidence indicates that Defendant was not unreasonable in responding to Plaintiff's 2009 request for a workplace evaluation. As detailed above, Plaintiff submitted a request, through a doctor's note, in February 2009 for an ergonomic evaluation of his workstation. (Pl. Dep. Ex. 20, ECF No. 19-1.) In early March, Nurse Noel, Defendant's employee, contacted Plaintiff regarding an evaluation. (Noel Dep. 25.) During March 2009, Ms. Gold, a third party ergonomic evaluator that Defendant hired, attempted to schedule the evaluation. (Pl. Dep. 330–33.) Ultimately, Plaintiff was unable to attend an evaluation due to his FMLA leave. (Pl. Dep. 333–35; *see also* Pl. Dep. Ex. 29.)

There is also no evidence that Defendant failed to accommodate Plaintiff during his period of disability leave. To the contrary, Defendant permitted Plaintiff to take leave and helped him obtain a new position when his disability period expired. Specifically, the record reflects

18

that Defendant allowed Plaintiff from May 2010 until August 2010 to perform an internal job search for a suitable position within the company.  (*See* Pl. Dep. 351–56.)

Finally, upon Plaintiff's return to work in September 2010 Defendant provided him with reasonable accommodations.  Plaintiff appears to concede that Defendant accommodated him when he returned to work in 2010.  (Mem. Opp'n 5–6, ECF No. 26.)  The evidence supports this conclusion.  Upon Plaintiff's return, Defendant promptly ordered him a chair that met the specifications that Plaintiff's doctor recommended.  (*See* Noel Dep. 51–52.)  By November 2010, Ms. Gold completed an ergonomic evaluation of Plaintiff's workstation.  (Gold Dep. 22–23.)  As a result of this evaluation, Defendant ordered and Plaintiff received a sit/stand workstation.  (Pl. Dep. 373.)  Finally, Plaintiff received a monitor riser in February 2011 because the sit/stand station did not extend high enough.  (Id. at 373–74; Noel Dep. 48.)

**B.  Disability Discrimination**

In addition to a failure to accommodate cause of action, Plaintiff also maintains that Defendant took adverse employment action against him.  Plaintiff's theory is that his supervisors repeated failures to respond to his accommodation requests eventually led to a constructive discharge, forcing him to take disability leave in 2009 and return to a reduced position in 2010.

To establish a *prima facie* case of disability discrimination under the ADA, Plaintiff must establish that (1) he was disabled; (2) he was other qualified for the job, with or without reasonable accommodation; (3) he suffered an adverse employment action; (4) Defendant knew or had reason to know of his disability; and (5) the position remained open or a non-disabled person replaced him.  *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012).  Within the context of a disability discrimination claim, in the alternative to demonstrating

19

an impairment that substantially limits a major life activity, a plaintiff is disabled if he shows that

he is regarded as having such an impairment or if he has a record of such an impairment.

*Milholland v. Sumner Cnty. Bd. of Educ.*, 569 F.3d 562, 565–66 (6th Cir. 2009).

The United States Court of Appeals for the Sixth Circuit has provided the following

guidance in assessing adverse employment action:

> An adverse employment action has been defined as "a materially adverse change in
> the terms and conditions of [a plaintiff's] employment." *White v. Burlington N. &
> Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc) (citation omitted). A
> "bruised ego" or a "mere inconvenience or an alteration of job responsibilities" is not
> sufficient to constitute an adverse employment action. *Id.* at 797. Adverse
> employment actions are typically marked by a "significant change in employment
> status," including "hiring, firing, failing to promote, reassignment with significantly
> different responsibilities, or a decision causing a significant change in benefits." *Id.*
> at 798 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).

*Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010).

An employee may show an adverse employment action by establishing that he or she was

constructively discharged. Constructive discharge "requires a finding that working conditions

would have been so difficult or unpleasant that a reasonable person in the employee's shoes

would have felt compelled to resign." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d

1099, 1107 (6th Cir. 2008) (internal quotations omitted). "A constructive discharge claim

depends upon the facts of each case and requires an inquiry into the intent of the employer and

the reasonably foreseeable impact of the employer's conduct upon the employee." *Id.* (internal

quotations omitted). The Sixth Circuit recognized in *Talley* that under certain circumstances "a

complete failure to accommodate, in the face of repeated requests, might suffice as evidence to

show the deliberateness necessary for constructive discharge." *Id.* at 1109 (internal quotations

omitted). The *Talley* Court emphasized that the defendants had, according to the plaintiff's

evidence, refused to read a doctor's note that she had provided. *Id.* The Sixth Circuit emphasized, however, that it was not "pav[ing] the way for an employee to assert a claim for constructive discharge every time an employer fails to accommodate a disability." *Id.*

Plaintiff's claim for disability discrimination fails for similar reasons to his failure to accommodate claim. Once again, the disability discrimination claim focuses on the failure of Plaintiff's supervisors to adequately respond to his accommodation requests between 2003 to 2009. Nevertheless, for the reasons detailed above, Plaintiff has failed to sufficiently demonstrate that—at least prior to 2009—he was disabled and that his supervisors knew of his disability. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996) ("[T]he defendant cannot discriminate 'because of' a disability if it has no knowledge of the disability."). For the same basic reasons, the evidence does not demonstrate that Plaintiff's supervisors perceived him as disabled within the meaning of the ADA. Moreover, Plaintiff's intermittent FMLA leave requests are not sufficient to establish a record of disability within the meaning of the ADA. *Cf. Blosser v. AK Steel Corp.*, No. 1:10–cv–359, 2012 WL 3112307, at *12 (S.D. Ohio July 31, 2012) (holding that taking FMLA leave, by itself, did not amount to a record of disability within the meaning of Ohio's comparable disability-discrimination statute).

To the extent that Plaintiff bases his disability discrimination claim on his circumstances in 2009, he fails to demonstrate adverse employment action. Plaintiff was not fired or otherwise demoted during this period. Moreover, the evidence does not reflect that Plaintiff was constructively discharged when he took disability leave in March 2009. Admittedly, until 2009, the evidence reflects that Plaintiff had made repeated requests for equipment and that his supervisors had failed to satisfy some of those requests. Nevertheless, Plaintiff's supervisors had

21

limited knowledge as to the extent of Plaintiff's condition.  Relatedly, prior to 2009, Plaintiff did not provide his supervisors with medical documentation—concerning his neck condition—to support his requests.[10]  Finally, as detailed above, when Plaintiff did provide medical documentation requesting an ergonomic evaluation in February 2009, Defendant responded and attempted to provide the evaluation.  In light of these circumstances, a reasonable jury could not find the deliberateness and intent necessary for constructive discharge under federal law.

## C.    Public Policy Claim

In addition to statutory discrimination claims, Plaintiff also attempts to bring a claim for wrongful discharge in violation of public policy under Ohio law.  Plaintiff specifically maintains that Defendant's failure to accommodate him resulted in constructive discharge in violation of public policy embedded within Ohio Revised Code § 4101.12.

To succeed on his public policy claim, Plaintiff must establish:

> (1) [A] clear public policy manifested in a statute, regulation or the common law; (2) that discharging an employee under circumstances like those involved would jeopardize the policy; (3) that the discharge at issue was motivated by conduct related to the policy; and (4) that there was no overriding business justification for the discharge.

*Knox v. Neaton Auto Products Mfg., Inc.*, 375 F.3d 451, 460 (6th Cir. 2004) (citing *Kulch v. Structural Fibers, Inc.*, 78 Ohio St. 134, 151 (Ohio 1997).

Ohio law also recognizes the concept of constructive discharge.[11]  *Mauzy v. Kelly Servs.,*

--------

[10]  As mentioned above, Plaintiff did provide a note from his optometrist relating to his need for a larger monitor due to his vision.  Plaintiff received such a monitor, however, prior to 2009.

[11]  The Court will assume, without deciding, that a constructive discharge is sufficient under Ohio law to establish a wrongful discharge.

*Inc.*, 75 Ohio St. 3d 578, 588–89 (Ohio 1996). Ohio courts apply an objective test, asking, "whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." *Id.* "In applying this test, courts seek to determine whether the cumulative effect of the employers actions would make a reasonable person believe that termination was imminent." *Id.* at 589. Under Ohio law, the Court need not look to the subjective intent of the employer. *Id.* at 589 n.4. Finally, "[p]art of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions." *Farris v. Port Clinton Sch. Dist.*, 2006 WL 964719, at *14 (Ohio Ct. App. Apr. 14, 2006).

Defendant is also entitled to summary judgment as to Plaintiff's public policy claim. Even assuming Plaintiff can meet the other elements of this cause of action, he fails to sufficiently demonstrate that he was constructively discharged under Ohio law. Specifically, for reasons similar to those discussed above, a reasonable jury could not conclude that Plaintiff's working conditions were so intolerably that he was compelled to resign. During the period from 2003 to 2009, Plaintiff's supervisors failed to meet some of his requests, most specifically, his requests for a new chair and a functioning monitor riser. Nevertheless, when Plaintiff ultimately took disability leave in March 2009, his prospects for receiving an accommodation were not hopeless. Prior to 2009, Plaintiff had not explored various options for obtaining his desired accommodations. Once again, until 2009, Plaintiff failed to put his supervisors on notice of the seriousness of his neck condition when making his requests. Most glaringly, when making his requests, Plaintiff failed to provide his supervisors with supporting medical documentation concerning his neck condition. Additionally, Plaintiff admits that he did not speak with human

23

resources regarding a potential accommodation until 2010.  (Pl. Dep. 258.)

Finally, this is not a case where Plaintiff was subject to hostility because of his accommodation requests.  At worst, the record reflects that Mr. Ostermeyer made a few sarcastic remarks concerning Plaintiff's need for a different chair.  (*See* Pl. Dep. 251.)  On the whole, however, the record and Plaintiff's deposition testimony indicate that he had good relationships with his supervisors.  (*See, e.g.*, Pl. Dep. 23.)  Furthermore, when Plaintiff did provide medical documentation concerning his neck condition in February 2009, Defendant—through Ms. Gold—attempted to set up an ergonomic evaluation prior to Plaintiff taking disability leave. Finally, as detailed above, when Plaintiff's disability leave had run, Defendant worked with him to find a suitable position and provided accommodations.  Ultimately, in light of the record evidence in this case, a reasonable jury could not conclude that Defendant's actions amounted to a constructive discharge.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**. (ECF No. 25.)  The Clerk is **DIRECTED** to remove this action from the Court's pending case list.

**IT IS SO ORDERED.**

2-6-2013
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

24